**LOUISIANA POWER & LIGHT CO.**

v.

**TOWN OF ARCADIA.**

Civ. A. No. 4151.

United States District Court
W. D. Louisiana,
Shreveport Division.

March 15, 1954.

Goff & Caskey, Arcadia, La., Monroe & Lemann, New Orleans, La., Theus, Grisham, Davis & Leigh, Monroe, La., for plaintiff.

Smith, Risinger & Shuey, Shreveport, La., for defendant.

DAWKINS, Jr., Chief Judge.

Tried to the court, the action is for a declaratory judgment[1]. Jurisdiction exists[2].

Plaintiff is a public service corporation. On March 1, 1951, pursuant to municipal ordinances regularly adopted, defendant granted plaintiff a franchise contract to furnish water to the town. Included, and presented here for interpretation, was the following proviso:

"We will supply to the Town of Arcadia, without charge, water for its sewage disposal systems, its municipal buildings, drinking fountains, and the cemetery. Should the Town waste water supplied without charge as aforesaid, we will give notice, in writing, specifying the waste complained of; and, if within thirty (30) days from the date of such notice the Town has not remedied such waste, or has failed within such period to commence and diligently prosecute steps to prevent such waste, we will thereafter be entitled to charge the Town for the amount of water wasted on the basis of the customary rate. In addition, we will supply, without charge, water for the operation of the present sixty-four (64) four-inch and fourteen (14) two-inch fire hydrants in the Town of Arcadia; and, for each additional twenty (20) water customers which we obtain in excess of our present five hundred and seventy-five (575), we will supply and install the necessary lines, furnish, install, and supply water for the operation of one (1) additional four-inch fire hydrant. The installation of such additional fire hydrants is in no way a limitation upon the provision regarding fire classifications as set out in paragraph (1) above. *Also, we will furnish and deliver water, without charge, to the proposed city natatorium and any city parks, when and if they are built, in sufficient quantity, quality, and volume to maintain reasonable operation of these facilities and meet all requirements of the public health authorities.*" (Emphasis supplied.)

The critical language is that emphasized in the quotation, for a dispute as to its meaning brought about this controversy.

In late 1952, defendant began detailed planning for a public swimming pool, tentative plans having originated some time earlier. Later, it advertised for construction bids in accordance with approved plans and specifications, providing for a so-called "flow-through" type of operation. This meant that the only method for changing water was by a continuous flow of fresh water through it.

State Board of Health regulations[3] affecting public swimming pools require that, for sanitation purposes, (1) in "flow-through" pools there must be a complete change of water at least twice each twenty-four hours, or (2) if this method is not used, an adequate filtration and disinfection system must be installed and utilized.

Defendant's pool has a water volume capacity of some 200,000 gallons. If water is furnished on a "flow-through" basis, about 400,000 gallons daily would be needed. Plaintiff's daily water plant

---

1. 28 U.S.C.A. § 2201.

2. Under the diversity statute, 28 U.S.C.A. § 1332, plaintiff is a corporate citizen of Florida; defendant is a Louisiana municipal corporation, its domicile in this district and division; more than $3,000 is in actual controversy.

3. Art. 9.0613, Chap. IX.

capacity is 500,000 gallons and daily normal consumption by the town is 350,000 gallons. Both parties agree, therefore, that it is impossible for plaintiff to supply water for the pool on a "flow-through" basis, and still fulfill the town's normal needs. Consequently, a filtration plant must be installed at the pool, if it is to operate.

The dispute as to the extent of plaintiff's obligations in this respect having arisen during construction, the parties agreed, without prejudice to the rights of either, and in order to minimize damages which will accrue to the loser, that necessary plumbing for future installation of the water purifying system be "stubbed-in" before the pool was completed. This was done.

The system must be installed and it will cost about $12,000. The question is: Under the contract, who must pay for it?

Each insisting that the other is liable for this necessary expenditure, the parties have advanced their respective arguments with much force.

Confronted, as we are, with a contract that is virtually silent on the particular point at issue, we look for guidance to rules of interpretation laid down by the Louisiana Civil Code and by State jurisprudence.

■ Contracts must be construed as a whole, not by clauses, sentences or paragraphs taken from context[4]. Their meanings should be interpreted in the light of conditions and circumstances existing at the time, and the parties' intentions are to be gained from all parts[5].

A fairly recent Louisiana Supreme Court decision[6] used this language:

"When courts are called upon to interpret written instruments purporting to evidence obligations, if any doubt arises, they look beyond the mere wording of the instrument itself and endeavor *to ascertain what was the true intent of the parties, for it is the intent of the parties which determines whether an obligation was assumed.*

"The Civil Code, under the heading 'Of the Interpretation of Agreements,' beginning with article 1945, prescribes the general rules for the interpretation of agreements. In article 1945 it is provided:

" 'That courts are bound to give legal effect to all such contracts according to the true intent of all the parties,' and:

" 'That the intent is to be determined by the words of the contract, *when these are clear and explicit, and lead to no absurd consequence.*

" 'That it is the *common intent* of the parties, that is, the intention of all, that is to be sought for; *if there was a difference in this intent, there was no common consent, and consequently no contract.'*

"Article 1950 reads as follows:

" 'When there is anything doubtful in agreements, we must endeavor to ascertain what was the *common intention* of the parties, rather than to adhere to the literal sense of the terms.' " (Emphasis supplied.)

■ Contracts should not be construed so as to impose absurd or impossible conditions upon either of the parties. This is a familiar rule recently reiterated[7] by the Louisiana Supreme Court:

"In the case of Rolland's Heirs v. McCarty, 19 La. 77, decided in 1841, it was held by this court that 'The

---

4. Art. 1955, LSA–Civil Code. "All clauses of agreements are interpreted, the one by the other, giving to each the sense that results from the entire act."

5. Fitzgerald v. Hyland, 199 La. 381, 6 So. 2d 321, citing Cerniglia v. Kral, 170 La. 372, 127 So. 872; Andrews Coal Co. v. Board of Directors of Public Schools, Parish of Orleans, 151 La. 695, 92 So. 303; Lozes v. Segura Sugar Co., 52 La. Ann. 1844, 28 So. 249.

6. Boisseau v. Vallon & Jordano, Inc., 174 La. 492, 141 So. 38, 40.

7. American Manufacturing Corporation v. National Union Fire Insurance Co., 203 La. 515, 14 So.2d 430, 433.

court will not presume, that parties make use of words in their contracts to which no meaning is attached by them. Some effect is to be given to every word if possible; and but rarely will the court reject words or phrases in a contract as surplusage'. In **Clay v.** Ballard, 9 Rob. 308, 41 Am.Dec. 328, decided in 1844, this court held that 'In the interpretation of a contract, it will not be presumed that either party intended to impose an *absurd or impossible condition'.*

"The general rule announced in the above cited cases has been consistently followed by this court. Istrouma Mercantile Co., Inc. v. Northern Assur. Co., Limited, of London, 183 La. 855, 165 So. 11, decided in 1935, and Gautreaux v. Harang, 190 La. 1060, 183 So. 349, decided in 1938." (Emphasis supplied.)

■ Finally, where a contract is silent, or virtually so, in respect to a point contended for by one of the parties, in particular as to what ought or ought not to be an incident of the contract, courts must ascertain and apply equitable principles to resolve the dispute [8].

■ Measuring this case by those standards, we readily arrive at the conclusion that defendant, not plaintiff, must bear the expense of installing the filtration system:

Reading the contract as a whole, and particularly that paragraph containing the disputed language, we note at the threshold the care taken to provide against "waste" of water, with respect to the town's use of free water in its sewerage system, municipal building, drinking fountains, and cemetery. Would it be reasonable to say that the parties intended to guard against waste in those relatively minor respects, but gave defendant carte blanche as to the swimming pool? We think not. To hold, therefore, that plaintiff is obligated unconditionally either to furnish defendant a daily volume of water for the pool amounting to 80% of its maximum plant capacity and 50,000 gallons above all other requirements of the town, or else pay for and operate the filtration system, would be to render nugatory the spirit of the agreement wherein it so carefully sought to provide against waste. Likewise, to say that plaintiff is obliged to furnish water on a "flow-through" basis, as the first of two alternatives given it, would be to say that it has a first choice which is admittedly absurd and impossible, and a second choice not even impliedly set forth and obviously not included in the common intent of the parties.

Plaintiff was to furnish water for "reasonable operation" of the pool. It would be a highly unreasonable operation, we think, which during six months or more of each year would require water on so vast a scale as defendant contends is plaintiff's primary obligation; and it would be grossly inequitable, we believe, to sanction defendant's enrichment at plaintiff's expense, which would be the inevitable result were we to hold the latter liable for the so-called second alternative.

As to the requirement that plaintiff furnish water for the pool which will meet Board of Health standards as to quality, we think a fair interpretation of this proviso is that it means pure water *as initially furnished,* in sufficient quantity for original make-up or reasonable replacement. We do not think plaintiff is obligated by the contract to maintain its quality continuously, once it has initially delivered sufficient pure water, if defendant chooses to re-use it.

To hold with defendant on this point would be to say that plaintiff must puri-

8. Art. 1965, LSA–Civil Code: "The equity intended by this rule is founded in the Christian principle not to do unto others that which we would not wish others to do unto us; and on the moral maxim of the law that *no one ought to enrich himself at the expense of anoth-* *er.* When the law of the land, and that which the parties have made for themselves by their contract, are silent, courts must apply these principles to determine what ought to be incidents to a contract, which are required by equity." (Emphasis supplied.)

fy the water, not just once, but an unlimited number of times. It would have to purify at its main plant before delivering water to the pool; and it would have to repurify, again and again, in a separate system paid for and maintained by it, at the pool. Obviously, that is a *non sequitur*.

Defendant contends that plaintiff simply made a "hard" contract for itself, by which it is bound. We do not agree at all. If the "alternatives" defendant advances were spelled out in clear, unmistakable language, we would have no choice but to enforce them. But where, as here, that was not done, and the wording obviously discloses that neither party intended to pay for a pool-side filtration system, which was not even mentioned or thought about in the contract as executed, we think the party who will obtain the benefits from the system ought to bear its cost.

For these reasons, there must be judgment for plaintiff in accordance with the prayer of its complaint. Proper decree, and suggested findings of fact and conclusions of law should be presented.