United States Court of Appeals,

Fifth Circuit.

No. 91-4638.

UNITED TEXAS TRANSMISSION COMPANY, Plaintiff-Appellant,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Etc., et al., Defendants-Appellees.

Nov. 18, 1993.

Appeal from the United States District Court for the Eastern District of Texas.

Before JONES and WIENER, Circuit Judges, and LITTLE,[*] District Judge.

WIENER, Circuit Judge:

We write today to resolve a long-standing dispute as to the party responsible for the costs of relocating sections of two pipelines which, pursuant to permits issued by the United States Army Corps of Engineers (the Corps), ran under the Hillebrandt Bayou (the bayou) in Southeast Texas. At all relevant times, the pipelines were owned by the United Texas Transmission Company (UTTCO). Their relocation was required to conform with a project to widen and deepen the bayou. This project was a joint endeavor of Jefferson County Drainage District NO. 6 (Drainage District) and the Corps. UTTCO refused the Corps' order to relocate the lines until UTTCO received assurances that it would receive reimbursement for costs and expenses of relocation. In turn, the Corps revoked UTTCO's permits to cross under the bayou, a navigable stream, and this litigation ensued.

The district court granted summary judgment in favor of the Corps and the Drainage District, holding that UTTCO could be compelled to pay for the entire relocation of the pipelines under the permits. The court also held that, in the face of UTTCO's refusal to comply with the Corps' order to relocate the pipelines, the Corps' revocation of UTTCO's permits was not an abuse of its discretion. Even though we view the case in a different manner than did the district court, we affirm.

I

[*]District Judge of the Western District of Louisiana, sitting by designation.

FACTS AND PROCEDURAL HISTORY

Historically, Southeast Texas in general and Jefferson County in particular have been plagued by destructive floods. Man's attempts to alter drainage patterns in the area have been legion but less than wholly successful. Specifically, since 1912, numerous efforts have been instituted to curb the problems resulting from the flooding of the bayou.

The instant widening and deepening project was instituted under the aegis of the Flood Control Act of 1965, which authorized many such projects throughout the country.[1] These projects are conducted as joint efforts between local sponsors, such as the Drainage District (with local funds furnished for the particular improvement), and the Corps (with funds appropriated by Congress).

In 1972, the United States and the Drainage District entered into a "Local Cooperation Agreement." Under that agreement, the Drainage District was to work with the Corps and was to provide all the necessary lands, easements, and rights of way necessary for the project. In addition, the Drainage District agreed to make "all necessary alterations and relocations of structures and utilities" that were necessary for the project.

In 1951 and 1956, UTTCO's predecessor in ownership of the pipelines was granted permits from the Corps to lay two gas pipelines under the bed of the bayou. When UTTCO acquired the pipelines it succeeded to these permits (and to easements across lands abutting the bayou—lands through which portions of the pipelines ran). The permits were issued by the Corps pursuant to § 10 of the Rivers and Harbors Act of 1899 (hereafter, § 10 permits). The language of ¶ (*f* ) of the instant § 10 permits is relevant to our inquiry. That paragraph provides, in pertinent part:

> (*f* ) That if the future operations by the United States require an alteration in the position or the structure or work *herein authorized* ... the owner will be required upon due notice from the Secretary of the Army, to remove or alter the structural work or obstructions caused thereby without expense to the United States....[2]

The scope of the Corps' authority under ¶ (*f* ) to demand relocation of the pipelines at the expense of the permit holder is at the heart of this lawsuit.

---

[1]P.L. No. 89-298, 79 Stat. 1073 (Oct. 27, 1965).

[2](Emphasis added).

In 1987, UTTCO was informed by the Corps that the pipelines would have to be relocated to accommodate the flood control project. UTTCO instituted the preparation of a preliminary estimate of the cost of the necessary relocations. When the results were received, the Corps and the Drainage District were advised by UTTCO that it was prepared to go forward with the relocation as soon as it received assurance from the Drainage District that UTTCO would be reimbursed for the entire cost of relocation—approximately $1,060,000. Initially, the Corps agreed with UTTCO's assertion that the Drainage District was responsible for at least some of the cost of the pipeline relocations. Later, however, the Corps took the position (with the Drainage District) that, under the language of the permits, the Corps could require UTTCO to relocate the pipelines and absorb the entire cost.[3]

When UTTCO made clear that it was not prepared to relocate the pipelines without assurances of reimbursement, a stalemate developed. The parties corresponded and met frequently, each attempting to convince the other that it had to pay for the relocations. These efforts failed, however, with a result that the flood control project was delayed by UTTCO's unflagging refusal to relocate its pipelines until it received assurances of reimbursement.

In February 1989, the Corps notified UTTCO that its § 10 permits had been suspended and advised UTTCO of its right to require a public hearing. According to that notification, appropriate action on the permits—which could include reinstatement, modification, or revocation—would be taken only after such a hearing (if one were requested). The public hearing was held in June 1989. The principal matter discussed was whether the Corps' use of its asserted authority to force UTTCO to move its pipelines at its own expense would be in the "public interest." UTTCO continued to refuse to bear the relocation cost, arguing that the Corps had no authority to order such a relocation. UTTCO also continued to maintain that under the Cooperation Agreement the Drainage District was

---

[3]UTTCO has maintained throughout the course of this litigation that, when the Drainage District began to run low on funds, it developed the plan to have the Corps to use its perceived authority under the § 10 permits to force pipeline owners to absorb the costs of relocations, thereby relieving the District of its obligation to do so under the Cooperation Agreement provision for the District to provide easements and relocations. We are concerned here with the Corps' authority under § 10 permits and not why it may have chosen to exert that authority.

obligated to pay for any required relocations.

After the public hearing but before the Corps took formal action on the permits, UTTCO filed the instant lawsuit, naming the Corps and the Drainage District as defendants. The lawsuit was filed in July 1989, and in it UTTCO sought monetary, injunctive, and declaratory relief. Essentially, UTTCO sought a determination that it could not be forced by the Corps to pay for the relocation of the pipelines.

In August 1990, over a year after this suit was filed, the Corps formally considered the status of UTTCO's § 10 permits. The Corps noted that UTTCO had been notified repeatedly of the need to relocate the pipelines, but that UTTCO had consistently refused to comply. The Corps also asserted that it had authority to revoke the permits of a recalcitrant permit holder such as UTTCO, citing a string of precedents which held that a permit holder does not have a vested interest in the permit. As for UTTCO's argument that the Corps had no authority to order relocation of facilities situated outside the boundaries of the stream as they existed when the § 10 permits were issued, the Corps found:

> The permits do not provide that future operations be within the stream bed of the Hillebrandt Bayou, or that the owner must be given assurance of compensation for such pipeline relocation on the fastlands [i.e., the lands outside of the original stream banks]. On the contrary, permit conditions state that the owner will be required to remove or alter the structural work for future operations without expense to the United States.

The Corps then revoked the permits, issuing its opinion on August 13, 1990.

The district court granted summary judgment in the instant case in August 1991. In its opinion, the court stated that "no dispute whatsoever exists as to the facts involved in the claims upon which summary judgment is granted."[4] That court found—at least implicitly—that some parts of the pipelines which had to be relocated lay inside the original boundaries of the streams and other parts of the pipelines which had to be relocated lay outside of those boundaries.[5] The court then held that UTTCO could be forced to pay the costs of accomplishing the required relocations of parts of the

---

[4]*UTTCO v. Corps,* 772 F.Supp. 952, 954 (E.D.Tex.1991).

[5]That court stated that "UTTCO has agreed that it is possible it does not have a claim against the federal government for the costs of relocating those parts of the pipelines located within the navigable waterway."

pipelines, including parts located outside the original banks of the bayou. Specifically, the court held that the work outside the original banks was incidental to the work inside the original banks, and that UTTCO could thus be forced to pay for the entire relocation.[6] The court also held that, inasmuch as UTTCO had improperly refused to obey the Corps' order to relocate the pipelines, the Corps was authorized, under the language in ¶ (*f*) of the § 10 permits, to revoke the permits and order the pipelines removed.

The district court summarized its view of the case and the arguments that UTTCO was making, stating:

> [T]his court opines that apparently the plaintiff pipeline owner here wishes to reap the benefits of conducting business over navigable waterways, without bearing any of the burdens. The court assumes the pipelines were constructed over the Hillebrandt Bayou because that was the most direct and profitable route for the transmission of natural gas. For over thirty years, pipeline owners have been profiting from the federal government's generous permission to cross a navigable waterway. Now flood control for a substanti al portion of southeast Texas is at stake, and the plaintiff wants the taxpayers to subsidize its relocation of its pipelines so the plaintiff can profitably transmit natural gas. Not only is such a position not good law, it is not good sense.[7]

The court denied UTTCO's summary judgment motion, granted those of the Drainage District and Corps, and ordered removal of UTTCO's pipelines. UTTCO timely appealed. We are advised that during the pendency of this appeal, both of UTTCO's pipelines were removed from the bayou and were not re-installed.[8]

## II

## ANALYSIS

As all must know by now, we review the record on appeal from a district court's grant of summary judgment "under the same standards which guided the district court."[9] The standards we

---

[6]*Id.* (quoting and discussing *United States v. 597.75 Acres of Land,* 241 F.Supp. 796, 799 (W.D.La.1965)).

[7]772 F.Supp. at 955.

[8]A letter filed jointly by the parties on June 10, 1993, at our request, confirms our understanding that the removal of UTTCO's pipelines was completed by July 1992, before argument was heard on this appeal, but after the parties' briefs were filed with this court.

[9]*Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988).

apply are set out in the Supreme Court trilogy of *Anderson v. Liberty Lobby, Inc.,*[10] *Celotex Corp. v. Catrett,*[11] and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[12] In our review of this case, we consider two issues of law: whether UTTCO could have been forced to absorb the entire cost of relocating its pipelines if it had done so; and whether the Corps abused its discretion in revoking UTTCO's § 10 permits after UTTCO refused to relocate sections of its pipelines as ordered by the Corps.

A. *Responsibility for Relocation Costs*

1. *Types of Relocation Orders and Responsibility for Costs*

There are essentially four factual situations that could be encountered when the Corps orders relocation of pipelines running under a navigable stream pursuant to a § 10 permit. The orders could require relocation of pipelines (1) wholly within the original banks of the stream; (2) wholly outside the original stream banks (e.g., when a stream is widened but not deepened, or at least not enough to require relocation of the portion of the pipeline lying beneath the original stream bed); (3) almost entirely inside the original stream banks but with some incidental involvement of relatively insignificant portions of the pipeline or related facilities located outside the original boundaries; or (4) both inside *and* outside the original stream banks, with substantial work in each area.[13]

Under our interpretation of the permit language, the correlative rights and obligations of the permit holder and the Corps differ significantly, depending on which type of relocation situation is implicated in the particular order. As the question whether the Corps properly revoked UTTCO's permits is dependent on the specific rights and duties that appertain under the type of relocation that is encountered in the instant § 10 orders, we shall first elaborate seriatim on the particular rights and

---

[10] 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[11] 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

[12] 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[13] For reasons explained below, a fifth possible way that the Corps could order relocation of a pipeline—a relocation outside of the original banks of the stream that would have an incidental effect inside the original banks—will be grouped with the fourth possibility for purposes of this analysis.

duties that flow from each of the four possible types of relocation.

a) Wholly within the Original Banks of the Bayou

As noted above, one of the aspects of this litigation which is not disputed is that permit-holders must pay for the movement of any portion of a pipeline that is located within the original permit area. The cases relied on by UTTCO in its brief to this court and its representations at oral argument confirm acknowledgement of this proposition. Solely for the sake of clarity and perspective, then, we reiterate the truism that the pipeline owner must bear the cost of relocation work within the original permit area, i.e., the boundaries of the bayou existing when the § 10 permits were granted.

In *Tenneco, Inc. v. Greater LaFourche Port Commission,*[14] on which UTTCO principally relies, we stated:

> Tenneco agrees that it is financially responsible for pipeline alterations necessary to accommodate changes in the channel that are made within the right of way purchased from the State—that is, changes within the bayou's original boundaries. Tenneco objects to paying for those changes occasioned by the channel's encroachment onto [the abutting owner's] property and onto Tenneco's easement there.[15]

UTTCO attempts to align itself with Tenneco. In discussing *Tenneco* and *United States v. 597.75 Acres of Land*[16] in its brief to this court, UTTCO states that "when a pipeline owner is compelled to relocate a portion of its pipeline *within the permitted area* (i.e., the portion lying between the banks of the waterway at the time of permit issuance) pursuant to a permit condition, then any relocation of portions of the pipelines lying outside the permitted area cannot be the subject of a claim for compensation when the latter is merely incidental to the required relocation within the Bayou." If nothing else, then, UTTCO agrees with the principle that the pipeline owners must pay for alterations to portions of the pipelines within the bayou's channel as it existed when the § 10 permits were granted; UTTCO simply insists that *all* alterations necessitated by the instant relocation orders were to portions of the pipelines located outside the original boundaries of the bayou, and therefore must

---

[14]427 F.2d 1061 (5th Cir.1970).

[15]*Id.* at 1064.

[16]241 F.Supp. 796 (W.D.La.1965).

be paid for by the Drainage District—or at least not by UTTCO.[17]

The pipeline owner's responsibility for all costs of relocation inside the permit area derives from the language of ¶ (*f* ) of the permits.  That paragraph states that "if future operations of the United States require alteration in the position of the structure or work *herein authorized, ...* the owner will be required to remove or alter the structural work or obstructions caused thereby without expense to the United States."[18]  This permit language clearly gives the Corps[19] the authority to order the relocation of the pipelines inside the boundaries of the original permit area at the expense of the pipeline owners.  As stated before, this is not in dispute;  only relocations in the areas outside of the original banks of the bayou—the abutting lands through which the pipeline owner had acquired private easements—is disputed in the instant case.  As noted, UTTCO insists that no relocation was required between the banks of the bayou as they existed at the times the permits were issued.[20]

b) Wholly outside the Original Banks of the Bayou

The Corps and the Drainage District argue that, pursuant to the Corps' authority under the § 10 permits, it may order the relocation of pipelines in areas outside the original boundaries of the bayou as well as the area within those boundaries, i.e., between the original banks;  and that these

---

[17]This point was made by UTTCO even more explicitly in its response to the Corps and the Drainage District's motions for summary judgment.  UTTCO argued:

> Further, UTTCO never refused to relocate the pipelines without expense to the United States.  Though [sic] not required to do so by the permit itself, UTTCO in fact expressly agreed to relocate portions of its pipelines within the Bayou that needed to be relocated (if any) *at its own expense.*  UTTCO also agreed to relocate even the portions of the pipelines lying *outside* the Corps' jurisdiction in privately owned fastlands at no cost to the federal government, provided that the Drainage District provide assurance that it would [pay for the relocations].

(Footnote omitted).

[18](Emphasis added).

[19]At oral argument, counsel for UTTCO argued that this flood control project is local and thus is not a "future operation[ ] of the *United States*."  We disagree.  This project was primarily for the benefit of the citizens of the area, but certainly there is flood control benefit beyond the immediate region of the Hillebrandt Bayou.  That this project is a "future operation of the United States" is evidenced by its authorization by act of Congress, substantial funding coming from the federal government, and the work of the Corps on the project.

[20]*But see* section II.A.2., *infra.*

relocations too must be made without cost to the government. We do not agree. The clear language of the permits that the Corps issued to UTTCO's predecessor limits the permit's coverage to the "work herein authorized"—i.e., the work authorized by the permits within the original bounds of the bayou. Thus, the language of the permits literally limits the Corps' authority to impose the costs of relocation on the holder of the permits to those costs properly allocated to relocation work in the area between the banks of the bayou as they existed at the time the permits were granted.

In the alternative the Corps and the Drainage District argue that the costs of relocation work outside the original banks can properly be assessed to permit holders under the "navigational servitude" possessed by the government. In their briefs to this court both the Corps and the Drainage District cite several cases that discuss the expansive powers of the federal government under the navigational servitude.[21] In addition, the parties argue at length about whether "navigation" per se is a requisite to invoking that servitude, and whether the work involved in this project is properly viewed as implicating "navigation."

The "navigational servitude" is an aspect of the sovereignty of the United States, "grounded in the power of the Federal Government to regulate commerce,"[22] entitling the government to exert a dominant servitude in all lands below the ordinary high water mark of navigable streams.[23] As noted in *Coastal Petroleum Co. v. United States,* "[t]his navigation servitude is an extremely old concept—owners of property or property rights *within navigable waters* take those rights fully cognizant of their limited nature."[24] One facet of the situation at issue in this case—that concerning portions of pipelines situated outside the original river banks—is by definition not *within navigable*

---

[21]*See United States v. Alaska,* --- U.S. ----, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992); *United States v. Cherokee Nation of Okla.,* 480 U.S. 700, 707, 107 S.Ct. 1487, 1491, 94 L.Ed.2d 704 (1987); *United States v. Twin City Power Co.,* 350 U.S. 222, 224, 76 S.Ct. 259, 260, 100 L.Ed. 240 (1955); *Lambert Gravel Co. v. J.A. Jones Constr. Co.,* 835 F.2d 1105, 1110 (5th Cir.1988).

[22]*Lambert Gravel,* 835 F.2d at 1110 (quoting *Coastal Petroleum Co. v. United States,* 524 F.2d 1206, 1210, 207 Ct.Cl. 701 (1975)).

[23]*See Cherokee Nation of Okla.,* 480 U.S. at 704, 107 S.Ct. at 1489.

[24]524 F.2d 1206, 1209, 207 Ct.Cl. 701 (5th Cir.1975) (emphasis added) (citing *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 808, 70 S.Ct. 885, 890, 94 L.Ed. 1277 (1950), and *Gibson v. United States,* 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996 (1897)).

*waters* and thus cannot be subject to the servitude. We find the question whether the project involved navigation to be irrelevant to our consideration. Even if we were to find the navigational servitude applicable, the Corps would still not here be authorized to assert the servitude outside the original banks of the bayou and therefore cannot order UTTCO to bear the expense of relocating those portions of the pipelines not located between the original banks of the bayou.

UTTCO held easements on the private lands (the "fastlands," i.e., those lands that are contiguous to but outside the original banks of the bayou) under the surface of which the pipelines passed. The instant project involved both (1) *deepening* the original permit channel, thereby affecting that section of pipelines lying in that portion of the bed of the bayou situated between the original banks, and (2) *widening* the bayou, thereby affecting substantial portions of the pipelines lying outside and on either side of the original banks. The proposition that the navigational servitude extends beyond the original banks of the stream (outside the navigable waters of the United States) is insupportable—as is the "bootstrap" proposition that the very act of widening the bayou brings "within navigable waters" the land previously lying outside the original banks but affected by the widening, thereby making it subject to the servitude retroactively.

The *land* outside the banks was not *taken* by exercise of the navigational servitude so that the bayou could be widened (for it could not have been), but was purchased from the landowners. In fact, title to that land was acquired *subject to* UTTCO's own pipeline easements! There is no merit to the Corps' argument that it can simply take private property rights (here, UTTCO's easements across private riparian property) that are not subject to a navigational servitude without compensating the owner for the property right thus taken. Yet that would be the precise result if we were to allow the Corps to obliterate UTTCO's easements on the fastlands by (1) acquiring those lands from private owners, (2) widening the bayou to encompass those lands, and (3) applying the navigational servitude thereto retroactively for purposes of forcing owners of pre-existing easements, such as UTTCO, to relocate their pipelines and other facilities at those owners' cost.

Unlike its non-property right in the permits to cross the bayou, UTTCO's easements in private property contiguous to the bayou but outside the banks do constitute property rights. Here, UTTCO

does not contest the Corps' ability to order the relocation of portions of the pipelines that are situated in the fastlands and must be moved to accommodate the widening of the bayou; UTTCO (like any farmer whose property is burdened by UTTCO's easement and lies in the way of the widening project) simply asks for compensation for the costs it will incur in relocating its pipelines within the affected areas.

c) Relocation Outside the Banks that is Incidental to Relocation Inside the Banks

As we have observed, no one seriously contests the rule that the cost of relocating the portion of a pipelines lying between the original banks of the bayou (i.e., the work that was either "herein authorized" under ¶ (*f*) of the permits or covered by the navigational servitude) must be borne by the pipeline owner. On the other hand, when the project requires the relocation of portions of the pipelines lying not between the original banks but in easements in the fastlands, the relocation costs generally must be borne by the appropriating governmental unit. We say *generally,* however, because there is one recognized exception: When the permit holder is required to relocate its facilities between the original banks of the waterway at no cost to the government, the permit holder will also be responsible for those costs incurred for work outside the original banks when such work is only incidental to the alterations required to be made between the original banks.

In *597.75 Acres,*[25] the district court stated that "a reasonable interpretation [of the permits] would also require that such incidental work on adjoining lands as is necessary to accomplish [the relocation within the waterway's banks] be effected at [the permit holders'] expense."[26] In *Tenneco,* we elaborated on this point, stating that incidental alterations include "changes the pipeline company must make "necessary to accomplish [the] purpose' of relocation within the riverbed."[27] We continue to recognize this exception, first discussed in *597.75 Acres* and reiterated in *Tenneco.* In other words, when a project requires relocation work to be done principally within the original boundaries of the stream (the work "herein authorized" by the permits or within the bounds of the pre-existing

---

[25]241 F.Supp. 796.

[26]*Id.* at 799.

[27]427 F.2d at 1066 (quoting *597.75 Acres,* 241 F.Supp. at 799).

navigational servitude) but some incidental work must be done in adjacent areas outside the banks as well (as a consequence of the work required inside the banks), the permit holders will be responsible for the entire cost of relocation of the pipelines.

d) Substantial Relocation Both Inside and Outside the Permitted Area

The final situation that might be involved when the Corps orders relocation is that in which the permit holder might be required to make substantial relocations of portions of the pipelines both within and without the original banks of the stream. We today hold that when the scope of the government project requires substantial work (as distinguished from incidental work), not only within the original banks but outside as well, the sponsoring governmental agency or subdivision shall be responsible for all reasonable costs incurred by the permit holder in relocating those portions of its facilities situated outside the original permit boundaries, i.e., outside the original stream banks. Of course, the permit holder will remain responsible for the costs attributable to the relocation work within the permit area.

This result flows naturally from the reasoning set forth in the foregoing analysis of the first three types of relocation orders. In fact, it is the corollary implicit in the "incident of work" rule of *Tenneco* and *597.75*. On one end of the spectrum, the language of ¶ (*f* ) of the § 10 permits clearly allows the Corps to force the pipeline owner to bear the cost of relocations inside the original riverbanks. On the other end, the government is clearly obliged to pay the expense of substantial relocations wholly outside the original banks. Obviously, each such case will require a factual determination concerning what portion of the relocation costs pertains to the work within the original permit area and what portion pertains to the work outside that area, for the expenses shall be borne accordingly. Only when essentially all relocation work is between the banks of the stream will the permit holder be responsible for costs attributable to outside work, and then only for that which is truly incidental to the bulk of the project, i.e., that within the banks. We caution, however, that no such "incidental" exception exists for the obverse situation in which the relocation order requires work on facilities situated almost wholly outside the stream banks. In such situations the permit holder remains responsible for costs attributable to *any* work between the stream banks, no matter

how incidental, given the permit's language.

2. *The Type of Relocation Situation Involved Here*

At oral argument to this court, counsel for UTTCO represented several times that all of the alterations to the pipelines involved in the instant case were to occur outside of the original permit area; that no portions of the pipelines lying within the banks of the bayou would be affected.[28] After a thorough review of the record, however, we find that assertion contradicted by (1) the evidence presented to the district court at the summary judgment hearing, (2) the findings made by the district court, and most importantly, (3) the findings of and evidence considered by the Corps in its proceedings for administrative revocation of the permits. Apparent from all of that—and contrary to UTTCO's assertions—are the conclusions that some portions of the required relocation work would necessarily involve segments of the pipelines situated under the bed of the bayou as it existed at the times the permits were granted, i.e., inside the original permit area, and that such work would be substantial, not merely incidental. The same is true of relocation work outside the original permit area. Thus, the type of relocation ordered is that described in subsection d) above: substantial relocation both inside and outside the permitted area. It follows inescapably, then, that UTTCO would have been responsible for all costs and expenses allocable to work inside the original banks of the bayou, but would have been entitled to reimbursement from the Corps or the Drainage District—or both—for the costs and expenses allocable to relocation work outside the permit area.

From the underdeveloped summary judgment record, however, it appears that UTTCO never attempted to show precisely how much of the pipelines involved in the instant case lay within the original permit boundaries and how much lay outside those boundaries. Even less determinable at this juncture is just what fraction of the total relocation cost that UTTCO would have incurred if it had obeyed the relocation order of the Corps would have been allocable to the inside work and what fraction would have been allocable to the outside work.

---

[28]This has been UTTCO's contention throughout this litigation. For example, the footnote we omitted from UTTCO's response to the Corps' and the Drainage District's motion for summary judgment, *see supra* note 17, asserts: "In point of fact, no such relocation [inside the original banks] was ever required."

B. *The Revocation of UTTCO's Permits*

In reviewing the Corps' revocation of UTTCO's permits, we must ask whether the Corps "acted in an arbitrary and capricious fashion, abused its discretion or otherwise acted not in accordance with law."[29]  This inquiry in turn requires a review of the findings of the Corps and the record made by that agency.  "If the agency decision cannot be sustained on the administrative record, then the case should be remanded to the agency for further consideration."[30]

The Corps revoked the permits because UTTCO refused to relocate the pipelines without assurances of compensation from the Corps or the District or both.  In its Statement of Findings that accompanied the revocation orders, the Corps stated:

> The permits do not provide that future operations be within the streambed of Hillebrandt Bayou, or that the owner must be given assurance of compensation on the fastlands.  On the contrary, permit conditions state that the owner will be required to remove or alter the structural work for future operations without expense to the United States.

Clear from the first part of this finding is the premise that if the facts revealed that some portions of the pipelines were within the permit area and those portions required relocation, the Corps would have the right to order such relocation at UTTCO's expense.  It follows that if UTTCO then refused to comply with the Corps' relocation order, the Corps could not be found to have abused its discretion by revoking the permits.

Our inquiry thus must begin with the fact question whether the Corps had substantial evidence to determine that some of the required relocation work would necessarily occur within the original boundaries of the bayou.  At oral argument, counsel for UTTCO asserted that the Corps had never made a finding that any of the alterations would have to be made inside the original banks of the bayou.  In its findings, however, the Corps stated:

> The project specifications set out in the enclosure 25 are in accordance with the Corps' regulation ... which requires pipelines to be at least five (5) feet below the bed *of the waterway.*  Both of UTTCO's pipelines fall *within this safety zone.*  Encl. 25.  Thus, the Secretary of the Army has the authority to seek removal or alteration of the pipelines in

---

[29]*See Bowles v. United States Army Corps of Eng'rs,* 841 F.2d 112, 116 (5th Cir.1988) (citing 5 U.S.C. § 706(2)(A)).

[30]*Id.* (citing *Camp v. Pitts,* 411 U.S. 138, 142-43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)).

accordance with condition (*f* ).[31]

Enclosure 25 of the findings includes two plats of the pipelines. Those diagrams clearly demonstrate that a significant part of the pipeline relocation would occur within the original permit area.

In addition to the statement quoted above, we have located several other places in the findings of the Corps at which the fact is recognized, at least implicitly, that some of the required relocation work would be within the bayou's original boundaries.[32] Interestingly, the Corps' findings often quote correspondence from UTTCO in which it asserted a willingness to pay for alterations that it recognized needed to be made inside the original permit area.

Coupled with the clear fact that portions of the subject pipelines lay within the original banks of the stream bed (so that UTTCO's refusal to relocate those sections of the pipelines in compliance with the Corps order would justify revocation of the permits), is the undeniable (and undenied) proposition that the Corps has the absolute authority to order relocations in the fastlands too. This flood control project was authorized by Congress, and the Corps had the unquestionable authority to determine the specifications—including the new placement of UTTCO's pipelines—for implementation of the project. As noted above,[33] UTTCO has never questioned the Corps' authority to order relocation in the fastlands; instead, UTTCO has merely denied any obligation to pay for the relocations in those areas which, it asserted at different points in the litigation, comprised the entire relocations.

The inescapable picture that emerges is that UTTCO thus engaged in the strong-arm tactic of refusing to relocate its pipelines in the face of the clear authority of the Corps to order the relocation. UTTCO opted to play an unwarranted game of hardball when, without any legal right to

---

[31](Emphasis added).

[32]For example, discussing a letter UTTCO sent to the Corps in August 1988, the Corps noted in its findings that "UTTCO further stated that almost all of such costs arise from the proposed widening of the Hillebrandt Bayou, and that only a small portion of the area from which UTTCO was advised to relocate is within the boundaries of the Bayou, and then only as an incident to the widening of the Bayou." At another point in the Corps' findings, it discussed UTTCO's assertion that a partial relocation of the pipelines, of the portions of pipeline within the original boundaries, would be senseless.

[33]*See supra* note 17.

do so, it demanded that the Drainage District assure reimbursement for the entire relocation costs—an allocation of costs that could never be correct in view of the fact that portions of the pipelines unquestionably were within the original stream bed. On the other hand, the Corps and the Drainage District were playing some hardball of their own: they were demanding that UTTCO bear the entire cost of relocating the pipelines even though substantial portions of the pipelines that had to be relocated lay in the fastlands, where UTTCO was not responsible for the cost of relocations.

If UTTCO had only complied with the Corps' order (even under formal protest), relocated the pipelines, and sued for compensation for the portions of its private easements that were taken and for the costs associated with the relocation in the fastlands, then under the reasoning set out above, UTTCO clearly would have been entitled to recover. UTTCO did not, however, follow this course. Instead, UTTCO delayed the project by demanding assurances of full compensation—to which it was not entitled—before it would begin work on the relocation. As it turns out, UTTCO's recalcitrance constitutes a valid cause for the Corps to revoke the § 10 permits. As UTTCO never challenged the Corps' authority to order the relocation, but nevertheless refused absolutely to relocate the pipelines, we cannot say that the Corps abused its discretion by revoking UTTCO's permits.

There is no provision of federal law to which UTTCO can point that would sanction the type of self help in which it engaged in this case. We have no choice, therefore, but to recognize that the Corps held the stronger hand (which it played with aplomb) and to affirm the district court's decision.

III

CONCLUSION

UTTCO does not—because it cannot—challenge the authority of the Corps to order relocation of UTTCO's pipelines to accommodate the subject drainage project. For the reasons set forth above, we have concluded that UTTCO was without legal justification in refusing to relocate its pipelines in response to those orders of the Corps. Thus the Corps did not abuse its discretion in revoking UTTCO's § 10 permits.

As a consequence of those permit revocations, UTTCO lost the option to relocate its pipelines, leaving itself no alternative but to remove those portions, both within and without the

original permit areas, that needed to be moved so that construction of the project could proceed. And, whether in recognition of the valid revocation of the § 10 permits by the Corps, or in compliance with the district court's judgment that is here being appealed, or for some other reason or reasons that are not apparent to us, UTTCO did in fact remove its pipelines from the bed of the bayou and from the fastlands.

Had UTTCO timely relocated its pipelines pursuant to the orders of the Corps, thereby preventing revocation of the § 10 permits that had allowed the pipelines to cross the bayou in the first place, UTTCO might have been successful in recovering, through the instant litigation, the costs incurred in relocating those portions of the pipelines that were situated outside the original stream bed—costs that clearly would not have been merely incidental to relocating the portions of the pipelines situated inside the original stream bed. But unfortunately for UTTCO, that was not the course of action it pursued; so we must affirm the judgment of the district court. In so doing, we do not speculate on any other remedies that UTTCO may even now retain against the Corps or the Drainage District.

AFFIRMED.